Will the court please call the next case? 5-16-0218 William Unthank v. Workers' Compensation Comm'n Good afternoon, Your Honors. May it please the court, my name is Kylie Jordan. I am here to represent the petitioner, Mr. William Unthank, in this matter. Specifically, cutting to the chase, Your Honor, the primary issue that is before you today is with regard to causation and whether or not the petitioner can return to work full duty or whether or not he requires, at a minimum, permanent restrictions limiting his work capabilities. The petitioner asserts that the medical evidence can only support the conclusion that, at a minimum, Mr. Unthank cannot return to his prior employment due to the permanent work restrictions that he requires in order to function at work. Doctors Ewell, Pata, and Valeric all stated that the petitioner was not capable of returning to his prior employment. Their conclusions were supported by two functional capacity exams, which both noted that the petitioner needed restrictions placed upon his work-life capabilities. The Commission relied upon Dr. Kowalski, which is the Section 12 examiner obtained by the respondent. They relied upon his opinions, and in doing so, they relied upon his opinions which were not supported by the medical evidence as a whole. Specifically, Dr. Kowalski had seen the petitioner on five separate occasions spanning several years. The first three occasions were on September 27, 2006, May 7, 2008, and January 21, 2009. On all three of those occasions, Dr. Kowalski gave petitioner continued work restrictions in order to continue working during this two-and-a-half-year span. Which the respondent was unable to accommodate. He also kept recommending either additional physical therapy or work hardening. At no point in time during any of those three examinations did Dr. Kowalski note in his records or make any findings of symptom magnification or malingering or inappropriate pain behavior. Fast forward to the last two times that Dr. Kowalski examined the petitioner. Like your honors, I became part of this case after the trial and after all the appeals, so I am limited to the record. In reviewing this record and in reviewing Dr. Kowalski's opinions, beginning with the September 23, 2009 opinion, I noticed a definite shift in his tone and in his opinions towards the petitioner. It definitely was a shift in that suddenly he has become suspicious of the fact that the petitioner has not gotten better. That in all of this time, since his initial injury in June of 2006 to September of 2009, he has consistently reported the same symptoms, the same pattern of symptoms, the same description of where it is hurting him. And this varying levels, but also with consistency of pain. Yet suddenly Dr. Kowalski seems to be irritated that the petitioner has not gotten better. In fact, the petitioner states that when undergoing this work hardening, his pain symptoms increase. And that the pain in his sciatic area and in his right buttock and hip is increased when he is forced to increase weights through the work hardening process. Did the claimant testify to that? The claimant did testify to that, but he also reported it very consistently to all of the physicians that he treated with throughout this process. Is there another issue looming here, and I'd like you to just briefly comment on it. As I'm reading this, it appears the commission determined the claimant's complaints of ongoing symptomatology were not credible. I mean, there's a component here where the commission itself didn't believe the claimant, correct? Yes, Your Honor, that is correct. So what do we do with the commission finding the claimant not credible? And then, of course, he's going to argue, not to conclude what he's going to do, but apparently they also found that then you have Strader's testimony who buttresses the claimant. The commission is going to say that that falls because it's based on a flawed premise. We don't find the claimant credible, therefore, Strader's opinion based on claimant is also not persuasive. So how do you address those issues? I address those issues with the fact that the commission has based those opinions on credibility with these two reports with Dr. Kowalski. Dr. Kowalski had issues with the patient's credibility with his symptomatology for a couple reasons, and the reason, my argument here is that his issues with the credibility of the patient's, or the petitioner's complaints of symptomatology are not supported by the medical evidence. Specifically, we start with the fact that on September 23, 2009, Dr. Kowalski stated that he doesn't, this is the first time, now he doesn't believe the petitioner's complaints because there's nothing on the MRI to support the symptoms that the petitioner's experiencing. Isn't that significant? It's not true, which is why it's not significant, Your Honor. What is shown is that on the July 11, 2008 MRI, Dr. Kowalski says there's no signs of abnormalities. That's not accurate. What the MRI shows is that there are diffused disc bulges at L4-5 and L5-S1, which are, I want to make sure I use the correct word, flattening, the opposing ventral fecal sac. And Dr. Pata, who reviewed this, stated that in his March 1, 2007 note that the findings on this MRI of these diffused disc bulging clearly are consistent with the petitioner's complaints because those are the areas where you have the dermatome nerve distribution where you're going to have sciatic pain and hip pain. So when he is doing this work hardening and potentially aggravating these diffused disc bulges, he continues to complain that as he's doing this, it increases his sciatic nerve pain. Well, this is consistent with the MRI findings. Additionally, Dr. Kowalski states that, well, I want to have a functional capacity exam performed. I want to know what his actual work capabilities are. I suspect that this FCE is going to show the symptom magnification in some language. So we have the first FCE, which was performed by Integrated Health on October 2, 2009. That first FCE finds that there was no symptom magnification, no malingering, and that the petitioner needs a lifting restriction of 20 pounds. Dr. Kowalski was unhappy with this. He said, this is not what I expected to see, so it can't possibly be accurate. He says that petitioner was, attorney referred him for this FCE, so I want an independent facility to do another FCE. Well, first of all, that's not true. That statement is not true. Dr. Ewell, the primary care physician, referred the petitioner for this FCE, but that's neither here nor there. Then we go to the second FCE. What was Dr. Ewell's interpretation of the November 2008 scan that you referred to? He basically, the radiologist, put on the report, what I reiterated was the radiologist's report of the diffused dysbulges. It's my recollection that Dr. Ewell simply read the radiologist's report and took the radiologist at his interpretation of the report. Based on what I see here, you will note that the November 2008 scans revealed no acute findings. Is that correct? Yes, it is no acute findings, your honor, which is two years after the initial onset of the injury. So at that point in time, it's possible that those findings would no longer be labeled acute. With regard to the second FCE, that specifically Dr. Kowalski requested, and that was obtained by a respondent, was organized by a respondent, so it's a quote-unquote independent facility, this FCE determined that the petitioner was at a minimum in the light duty demand for work restrictions. He was able to do some of the medium demand work, but not all, and he definitely did not meet the medium demand plus category. Now, they said that Dr. Kowalski found problems with this report as well. He stated that the petitioner's heart rate did not increase appreciably while performing these activities, so clearly he's not putting forth a full effort. That's not what the FCE says. The FCE says that petitioner's resting heart rate was very low, it's naturally resting at 44 beats per minute, which is, I have a low heart rate and it's like half of mine, but that when he was performing these activities, his heart rate did increase, and it's noted in the FCE that it at least doubled. Now, it did not meet the aerobic maximum level that they like to see, but the FCE examiner said because his heart rate is a lower heart rate, and because he's been medically tested for a low heart rate, we can't factor that in and use that as a determination that he's not putting forth a full effort. On top of that, they did not believe that that to be a self-limiting behavior, essentially. Dr. Kowalski also stated that petitioner had poor psychosocial dynamics, and therefore he's not putting forth a full effort and his results aren't reliable. That's not what the FCE says either. The FCE examiner tested the petitioner in six different ways to determine reliability. Three of the ways are, the first way is the petitioner consistently reporting his pain complaints and where they're located. Two of the ways are objective, the examiner observing the petitioner and determining whether or not he's putting forth a reliable effort. And the last three are written questionnaires. Here's where we come into a problem. The petitioner can't read. He has a second grade reading capability and a first grade writing capability. The examiner had to read to him these questionnaires and then we have to make the assumption that not only that he read these questionnaires accurately, but that the petitioner understood them. And this is again with a man who has a second grade reading capability and first grade writing capability, whether or not he understood what these questionnaires were asking. Now, the FCE said that these responses to these questionnaires, I mean there was some question there about the reliability, but it also could be explained by the fact that he's had this injury for so long. And it's important to note that at no other time during all of the seven years of treatment this petitioner underwent, did anyone, including Dr. Kowalski, note positive signs of pain magnification and symptom magnification and malingering. So essentially, Your Honor, Dr. Kowalski again ignored the second FCE, which placed restrictions on the petitioner. So the reason Dr. Kowalski questioned all of the credibility of the petitioner based upon all of these findings that weren't actually findings within the FCE and the commission relied upon Dr. Kowalski's opinions, which are not based in fact and are not based in the medical evidence. And then if you find that the petitioner has satisfied his burden of proving that he at a minimum requires restrictions with regard to his work capabilities, then we move on to the second prong of the, at least the odd lot from total theory, which is whether or not due to his age, his education, and his transferable skills, et cetera, he is able to compete into a well-known labor market that is a well-established labor market. Essentially, the petitioner underwent a vocational assessment by Jack Schrader, as you noted, Your Honor, on September 20th, 2010. Dr. Jack Schrader is a certified rehabilitation counselor. He's done this for 40 years. I will just somewhat summarize his findings, which were, as I've already gone over the limitations to the petitioner's reading and writing capabilities, the petitioner dropped out of school, and I'll summarize very quickly, in the eighth grade at the age of 16. He was severely learning disabled. He's not able to complete a job application on his own, according to Mr. Schrader. And in his history of work, he has only ever worked as a laborer in the medium to heavy, to exceedingly heavy work category. So it was Mr. Schrader's opinion that the petitioner was not employable with those considerations, in addition to his current pain levels. Thank you, Your Honors. Thank you, Counsel. You have time to reply. Counsel, you may respond. May it please the Court, I am Bruce Magnuson, representing the employer in this situation. This case was tried before Arbitrator Gallagher of the Commission, and after reviewing the evidence and the testimony, found that the evidence did not support the contention that this petitioner proved he was permanently and fully disabled. The evidence was all reviewed by the three-member panel of the Workers' Compensation Commission, and they unanimously affirmed Arbitrator Gallagher's ruling. The circuit court considered all of the evidence, the briefs, the oral arguments, and likewise found that the Commission's decisions were not against the manifest weight of the evidence. The function of this court, we've all known, is well-established. In order for the previous rulings to be overturned, you must find that they are against the manifest weight of the evidence. As this panel recently noted, back in April of this very year, in the case of Johnson v. The Industrial Commission, for the Commission's decision to be against the manifest weight of the evidence, the record must disclose that an opposite conclusion clearly was the proper result. Now, the petitioner's case is based upon evidence from Dr. Jewell, Dr. Zolarich, Jack Schrader, and then the petitioner's own testimony regarding his subjective complaints and his abilities. The respondent feels, and the Commission found as well, that all of these facets have some problems. First of all, we're dealing with the weight of the medical opinions. Dr. Jewell is the primary supporter for the petitioner's case, and as was established, Dr. Jewell is a primary care physician. He's not board-certified in any area. He doesn't specialize in orthopedics, orthopedic surgery. He testified he doesn't specialize in neurology or neurosurgery. He's also not a surgeon as well. Dr. Zolarich, who examined on one occasion at the request of Mr. Unthank's attorney at the time, Mr. Feiss, is a specialist in nuclear medicine and independent evaluations. And he is not a spinal expert and also does not do surgery. You look at Dr. Kowalski, even though he is what's labeled as the Section 12 examiner or the I.N.E. physician, in this case he saw the petitioner on five occasions over four years, not just the one shot. Obviously, she has several doctors, and you pointed out, I think, some of the flaws relative to their testimony. And she is going to get up and say, aha. Obviously, Kowalski, I understand her argument, his findings, his opinion is flawed because it's based on clearly erroneous interpretation of the medical evidence. That seems to be the essence of her argument. What do you have to say to that? Well, I would say, first of all, with regard to her view of the diagnostic testing, when Dr. Kowalski reviewed the MRI that she referred to, because the main injury was fractures to the lumbar vertebrae that were very non-displaced and healed quickly. Dr. Buell even agreed with that. On that same test, he saw there were very minimal degenerative changes with very slight dehydration at L4-5 and L5-S1. There was nothing in there that showed herniation or spinal stenosis. Now, that's also supported by Dr. Kee Park, who saw this petitioner early on in the case at the request of Dr. Ewell. Dr. Park is a neurosurgeon who no longer practices, but used to practice in Cape Verde, Missouri. He examined the petitioner and found nothing from a neurologic standpoint. You heard an argument that, obviously, Kowalski misinterpreted and you've got to find it, right? You heard that argument? Yes, I did. Dr. Kowalski looked at all of the diagnostic testing. He expressed his opinion about what he thought it saw. He also looked at these FCEs and the doctor is able to interpret those. He's a medical expert. He can interpret those findings in light of what he saw in the physical examination, which each time showed no neurologic abnormality. There was never any recommendation that this man needed surgery. Strictly subjective complaints with occasional findings of spasm, but otherwise there was nothing of a significant objective standpoint in any of these cases. And was the commission troubled by that? Did the commission have some credibility problems relative to the claimant? Yes, they did, and that came from testimony regarding his activities outside of the medical arena. First of all, there was the one with him power washing. Dr. Kowalski was able to view a DVD showing the power washing. On occasions, men who said his back was in such pain that he gave ratings of 6 to 7 out of 10 each time he saw Dr. Ewell without using a power washer and a wand, washing a two-story metal building. Dr. Kowalski, who said he, in fact, has done power washing himself, said that if the man had the level of symptoms he was complaining of, that would not be possible. He would not be able to do that in the way it was shown on the film. He was moving freely, not showing any signs of distress, showing no signs of discomfort. So that raised certain questions of credibility about the petitioner's own presentation in regard to his subjective complaints. Because if you look at the examination results, there's nothing in the way of objective, abnormal neurologic findings, orthopedic findings, findings of spasm that Dr. Ewell seems to rely on, and subjective complaints. Then there was the second event or series of events that questions his credibility. That was the mud running. The petitioner admitted to that that he had done that in various times throughout 2006 and 2011. And what's also significant is that... Excuse me, counsel, what kind of mud running was that shown in the video? Was that using a vehicle? Yes, it was just a vehicle. He owned an old Chevrolet Blazer, which had the outlaw painted on the tailgate. We do these mud running events. Perhaps you've heard of those since you live in southern Illinois. I've actually invented them. Anyways, he had a big truck, and they would drive it across the field into a bog, and keep going as long as possible with the speed wheel spinning until it bogs down. The person who gets the farthest wins the prize. So there's video of that, too? There was video of that. Unfortunately, we were not able to put it into evidence, but the petitioner did testify during cross-examination that he had engaged in those activities. So the video is not in evidence? The video is not in evidence, unfortunately. He would like it to be. I very much would, but unfortunately, both investigators who took these films had left their employment, and I was unable to track them down. Luckily, Dr. Kowalski had seen the power washing and describes it, and the petitioner did admit to the mud running during my cross-examination of him. He testified he had won several prizes during those years, and he had gone to two events in July of 2011, not too long after he had seen Dr. Ewell, and told him that his back complaints were at a level of 7 out of 10. And he'd also seen Dr. Valarich in June of 2011, telling him he no longer drove his mud truck, which in fact he was doing, and in fact did the next month, and admitted to it. So therefore, the petitioner's own presentation to his doctors was not completely forthright about his capacities and his abilities, and therefore that raises questions about how reliable anything is from a functional capacity evaluation, which the significance of it needs to be interpreted by a medical expert, which in this case was Dr. Kowalski, who as we noted is a board-certified orthopedic surgeon. He specializes in treatment of the spine, and he also has at times in the past taught medicine in a medical college in Pennsylvania. So here's a man who has much greater experience, credentials in treatment of the spine, analysis of the spine, as compared to the primary care doctor, who is not board-certified, and the one-time examiner, Dr. Valarich, who is not a surgeon as well. So all of that goes together to question the petitioner's credibility with regard to his presentation. I think the commission picked up on that, which is also why they discounted Mr. Strader's opinions, because it's based on exaggerated or possibly non-credible complaints. There's other problems with Mr. Strader's opinion as well. He met the man on one occasion, June 2, 2010, and issued his report a couple months after that. He did not see any of the medical evidence generated subsequent to that date, including Dr. Kowalski's records or the records up through August of 2013, which is where the record ends when we try the case. He didn't see the surveillance films, obviously. He took all of the complaints at face value and relied upon those exaggerated complaints. And as I've just discussed, the petitioner's subjective complaints are certainly questionable in light of his activities with power washing and the mud running. Dr. Kowalski said during his deposition that if the petitioner was presenting his symptoms honestly to the doctors, he would have been unable to perform the task of power washing. Those were inconsistent with his subjective complaints and his presentation. With regard to proving permanent total disability under the odd lot theory, which is not in the statute but is developed through case law, there's two aspects. Petitioner first must show a diligent but unsuccessful attempt to find work. And there's no evidence of that in the record that he made a diligent attempt. He testified at arbitration that he tried a few things. He didn't feel good and didn't do much more, but there's no evidence as to what he tried, who he applied to for a job, what types of jobs he applied for, any number of things. There's nothing in there that supports a diligent job search. So then he goes on to the second prong, which is based upon the flawed opinion of Mr. Strader, which the arbitrator found flawed to the extent that he found it to lack credibility. In order to establish odd lot permanent total disability status, the patient has to establish by a preponderance of the evidence cited in the city of Chicago case in 2007, that he falls within the odd lot category. We contend that his evidence does not meet the standard in that, based upon what Dr. Kowalski found in the later part of the case, based upon his review of all the diagnostic testing, his review of the FCEs, his review of Petitioner's power washing activities, that his complaints therefore are not credible and therefore he could return to work. We would ask that the Honorable Court affirm the decision of the Commission in its entirety. Thank you very much. Thank you, Counsel. Counsel, you may reply. Thank you. So to address the two specific activities that were discussed, we'll start with the power washing. Dr. Kowalski testified that he reviewed two videos, one of which was a 20-minute video showing the Petitioner off and on. The video would pause and then jump forward in time and then pause, not necessarily pause, but it would take a break and not show the Petitioner. And then the second video showed the Petitioner on the second day of surveillance doing nothing. So the power washing. During all of his physical examinations, including with Dr. Kowalski, at no point in time was it ever noted or did Petitioner ever allege that he could not bend, twist, flex, or extend with his spine. He simply explained that it caused him pain to do so. And that was objectively identified with regard to the muscle spasms that he would get in his back when he would do those activities. I would also note that Petitioner has been continuously prescribed pain medication to deal with those activities. So my point in that goes to the fact that Petitioner testified, yes, I did, even despite the fact that the video wasn't in evidence, he did testify, yes, I did do power washing. I hurt afterwards. I did it for approximately, to help a friend, for approximately two hours. Afterwards I was hurt. I was laid up on the couch the next day, was his statement after that. Life goes on. So you can't necessarily expect a person, simply because they experience pain, to stop every single activity of their daily living. With regard to the mud running and his hobbies, Petitioner testified that he used to have hobbies of fishing and hunting, but he no longer did those things. He used to have a motorcycle and a four-wheeler and ride those things, but those caused him too much pain. So he sold those things. He said the last thing he had was mud running, and that he did it with his children. In his testimony, he wasn't, he said that a mud running, which I'm from Southern Illinois, and I was not familiar with what it was, but it involves a 100-foot track that, as Mr. Magnuson correctly stated, you drive your truck down as fast as you can. By my appearance, and you do two passes through this at one event, it takes approximately 45 seconds to drive down this. So they might have been the longest two periods of 45 seconds of my life while reviewing this, but it is a very quick 45 seconds in a person's daily life. In his testimony, he wasn't extremely clear. He did admit that he had, at some point in time over the years, still done some of those activities. He said that what wasn't clear is that he also has a 23-year-old son that he does this with, that also drives the truck, where some of the confusion lies is how much the petitioner did it and how much his son was doing it, because he did testify that at times when asked about it, he said, yes, my truck competed in that event, and yes, my son drove at that event. I don't know that he was inconsistent so much as it just wasn't clear how much he was doing it versus how much his son was doing it, simply that it was an activity, as he said, the last activity that they had that they could do together, because he could no longer play sports with his son or his children. And that is all I have to say unless you have additional questions, Your Honors. I don't believe the court does. Thank you. Thank you, Your Honor. Thank you, counsel, both, for your arguments in this matter. We take no advisement that this position should issue. Safe trip home. Thank you. Court will stand in recess until 9 o'clock tomorrow morning.